UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PHILLIP MARION CRAWFORD,<br><br>Defendant. | Criminal Action No. 23-426 (JEB) |

**MEMORANDUM OPINION**

Defendant Phillip Marion Crawford participated in the insurrection at the U.S. Capitol on January 6, 2021. He is charged with multiple criminal counts related to such conduct. With trial set for later this month, both he and the United States have filed Motions *in Limine* concerning video evidence. The Government seeks an order allowing admission of two video montages, one of which compiles footage captured by cameras at the Capitol building and grounds on January 6 along with audio recordings of police calls, while the other compiles video clips of Congress's proceedings that day and portions of the Congressional Record. See ECF No. 31 (Riot Montage Mot.); ECF No. 30 (Congressional Montage Mot.). Defendant, meanwhile, seeks to exclude video footage of his arrest last summer at his Georgia home. See ECF No. 33 (Arrest Video Mot.). The Court will grant the Government's Motions, with a caveat described below, and it will grant in part and deny in part Defendant's.

I.      **Background**

Crawford has been indicted on no fewer than eleven counts: Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count I); Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Counts II, III, IV, and V); Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b)

1

(Count VI); Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Count VII); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Count VIII); Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (Count IX); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C § 5104(e)(2)(D) (Count X); and Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count XI).  See ECF No. 34 (Superseding Indictment).  With trial approaching, the Government and Defendant have both filed Motions *in Limine*, all of which are now ripe and will be addressed together.

## II.    Legal Standard

"[M]otions *in limine* are a means for arguing why 'evidence should or should not, for evidentiary reasons, be introduced at trial.'"  Graves v. District of Columbia, 850 F. Supp. 2d 6, 11 (D.D.C. 2011) (emphasis omitted) (quoting Williams v. Johnson, 747 F. Supp. 2d 10, 18 (D.D.C. 2010)).  They "are 'designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions.'"  Id. at 10 (quoting Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1069 (3d Cir. 1990)).  The court has "broad discretion in rendering evidentiary rulings, . . . which extends . . . to the threshold question of whether a motion *in limine* presents an evidentiary issue that is appropriate for ruling in advance of trial."  Barnes v. District of Columbia, 924 F. Supp. 2d 74, 79 (D.D.C. 2013).

Although state and federal rulemakers have the prerogative to fashion standards for the inclusion of evidence at trial, the Constitution guarantees to criminal defendants the right to a "meaningful opportunity to present a complete defense."  Holmes v. South Carolina, 547 U.S.

2

319, 324 (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)). This limits courts' ability to impose "arbitrary" rules of evidence, including those that exclude "important defense evidence" without serving "any legitimate interests" or are otherwise "disproportionate to the purposes they are designed to serve." Id. at 324–25 (internal quotation marks omitted). At the same time, it falls within a court's discretion to exclude evidence that is not relevant or whose probative value is "outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, . . . or needlessly presenting cumulative evidence." Fed. R. Evid. 403; see also Holmes, 547 U.S. at 330 (noting that evidentiary rules seek to "focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues").

**III.   Analysis**

The Court begins with the Government's Motions and then turns to Crawford's.

A.   Montage Videos

In separate Motions, the Government asks the Court to admit two video montages. The first — the "Riot Montage" — is a fifteen-and-a-half-minute amalgam of surveillance footage capturing what occurred on the Capitol Grounds and inside the Capitol building during the afternoon hours of January 6, 2021. See Riot Montage Mot. at 1–2. It overlays audio "derive[d] from recorded 'radio runs' from the U.S. Capitol Police communication system," id. at 3, and also includes "satellite map depictions to orient the factfinder [to] the area of the U.S. Capitol and the general area [in] which the [video] depictions are occurring." Id. at 2. The second — the "Congressional Montage" — lasts nine-and-a-half minutes and depicts congressional proceedings on January 6. See Congressional Montage Mot. at 1–2. In particular, it "compiles portions of the official Congressional Record with portions of official Congressional Media and depicts the Congressional activities in a way that illustrates Government business was in fact

3

occurring on January 6, 2021, and was delayed and impeded as a result of the mob that entered the building." Id. at 2.  Because Crawford opposes the admission of both montages for the same reasons, the Court assesses them jointly.  See ECF Nos. 40 (Riot Montage Opp.); 41 (Congressional Montage Opp.).

       *1. Rule 1006*

Defendant initially asserts that the montages are not proper "summary evidence" under Federal Rule of Evidence 1006.  See Riot Montage Opp. at 6–11; Congressional Montage Opp. at 3–6.  That Rule provides that a party "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs [including videotapes] that cannot be conveniently examined in court" as long as it "make[s] the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place."  See also United States v. Weaver, 281 F.3d 228, 232 (D.C. Cir. 2002) (this Rule is "an exception to the best evidence rule").

Crawford does not dispute that the Government has provided him with access to the originals that it used to create the montages — in the case of the Riot Montage, a whopping total of "more than 7.96 million files, including 32,000 files including body-worn and hand-held camera footage from five law enforcement agencies and surveillance-camera footage from three law enforcement agencies."  ECF No. 43 (Riot Montage Reply) at 3.  Nor does he — or could he — contest that the originals are too voluminous to "be conveniently examined in court" in full.  See Fed. R. Evid. 1006; see also Riot Montage Reply at 3 (it "would take more than a year to view" the footage underlying the Riot Montage "continuously"); Congressional Montage Mot. at 4 (the Congressional Montage summarizes "91 pages of the congressional record, along with more than 15 hours of relevant footage from both chambers").

4

Instead, Defendant contends that the montages are not proper "summar[ies]" because of the editorial choices that the Government made in creating them. See Riot Montage Opp. at 7–8; see also id. at 8 ("[T]he government's montage is more than just a compilation, because it is editorialized: a product of intentional manipulation and arrangement . . . . [B]y combining, rearranging, splicing, superimposing, and generally putting these pieces of [video footage] into a montage, the government is actually changing the evidence that it purports to summarize."); id. at 10 (the "montage has a powerful, Ken Burns-like effect, depicting the events around the Capitol as a coordinated battle or war, with various groups of protesters maneuvering like attacking armies and overwhelmed Capitol police reacting like besieged combatants"); Congressional Montage Opp. at 4–6 (similar).

Not quite. To start, Crawford seems to ignore the fact that Rule 1006 applies precisely where the original pieces of evidence are too voluminous to "be conveniently examined in court," such that they must be condensed, arranged, and edited to create a summary, as the Government did here. The fact that the Government made decisions about which footage to include and exclude in the montages and how best to compile that footage, among other things, is therefore neither surprising nor troubling under that Rule; if anything, it is inevitable.

It would be a different story, of course, if Defendant argued that the montages actually misrepresented events. But his assertion that they simply "do[] not compile videos and documents neutrally, but rather clip[] and combine[] them in an argumentative way," resulting in a "different, more persuasive effect" than the original footage would have, does not cut it. See Riot Montage Opp. at 9; see also Congressional Montage Opp. at 5 (similar). Indeed, the Court hopes that the "effect" of a fifteen-and-a-half-minute montage would be different from that of "nine terabytes" of footage that "would take more than a year to view continuously," not least

5

because the experience of viewing the latter would prove soporific in the extreme.  See Riot Montage Reply at 3.

The only argument that Defendant offers that actually attempts to cast doubt on the accuracy (as distinct from, e.g., the "effect") of the montages relates exclusively to the police radio runs included in the Riot Montage.  Specifically, Crawford highlights that this montage "superimposes uncited, unexplained audio recordings onto video clips and images with which the audio recordings were not originally connected."  Riot Montage Opp. at 10.  Such superimposition "raises a significant authenticity issue," he says, because "without the individual recordings themselves, verified by those who could authenticate them," he has "no way of ascertaining whether or not the audio recordings are authentic reproductions of the police calls, from how many sources of material they were derived (i.e. how many different recordings), and whether times indicated in the video montage are the same times at which the recorded calls took place."  Id. at 10 n.2.  No similar concerns exist with respect to the Congressional Montage.

Crawford's concerns about the Riot Montage's superimposition of audio are reasonable, especially because the audio recordings — unlike the video clips — do not contain timestamps indicating when they were made, and the Government offers no response to his audio-related points in its Reply.  Those concerns do not, however, provide a basis for excluding the Riot Montage in full.  Instead, the Court will require the Government to elicit witness testimony (in the event no stipulation can be reached) that (1) confirms both that "the audio recordings are authentic reproductions of the police calls" and the "times indicated in the [Riot Montage] are the same times at which the recorded calls took place," and (2) explains "from how many sources of material they were derived (i.e. how many different recordings)."  Id.  If the United States has not already made the original audio recordings "available for examination" by defense

6

counsel "at a reasonable time and place," moreover, it shall do so before trial.  See Fed. R. Evid. 1006.

        2.  *Relevance and Prejudice*

Crawford next posits that both montages are irrelevant and thus inadmissible.  With respect to the Riot Montage, he emphasizes that the vast majority — *i.e.*, all but 38 seconds — depicts "places and times where [he] was not present."  Riot Montage Opp. at 12.  As to the Congressional Montage, most of events shown "occurred well before the alleged offense conduct with which [he] is charged."  Congressional Montage Opp. at 3.  Plus, he "at no time" appears in the latter.  Id.  Even if the montages were relevant, moreover, Defendant believes that their probative value is outweighed by the risk of unfair prejudice and confusion of issues.  See Riot Montage Opp. at 16–17; Congressional Montage Opp. at 8–9.

Unfortunately for Crawford, this Court rejected an analogous argument last year in United States v. Carpenter, 2023 WL 1860978, at *3–4 (D.D.C. Feb. 9, 2023).  That case involved similar charges and a montage much like — if not identical to — the Riot Montage at issue here.  See Riot Montage Reply at 4 ("[T]he [Riot Montage] proposed in this case is the same that was admitted at trial in Carpenter."); but see Riot Montage Opp. at 15 (noting that montage in Carpenter was longer than one here).  Carpenter objected to the introduction of that montage on relevance and prejudice grounds, which the Court found unavailing.  It explained that "general evidence of the events of January 6 [was] probative of several elements of the crimes with which Carpenter [was] charged," and "[i]n the context of" those charges, "the weighty probative value of evidence that broadly depicts what happened on January 6 outweigh[ed] any potential prejudice or cumulativeness."  Carpenter, 2023 WL 1860978, at *3–4.  Other judges in this district have denied similar motions *in limine* in criminal cases stemming

7

from the January 6 attack on the Capitol Building for these same reasons.  See United States v. Stedman, 2023 WL 3303818, at *2 (D.D.C. May 8, 2023) (collecting cases).  That well-trodden path is, in the Court's view, the correct one here, too.

Start with relevance.  The Government must generally be given leeway to place a defendant's actions into context and to assist the jury in "organiz[ing] and evaluat[ing] evidence [that] is factually complex and fragmentally revealed."  Carpenter, 2023 WL 1860978, at *3 (quoting United States v. Lemire, 720 F.2d 1327, 1348 (D.C. Cir. 1983)).  The Riot Montage and Congressional Montage both would permit the United States to do just that.  Cf. Stedman, 2023 WL 3303818, at *1 ("[G]eneral evidence about the events on January 6 — even if defendant did not personally observe all of the conduct engaged in by others in multiple parts of the Capitol Building and restricted grounds — assists the jury in better understanding the parties' actions that day and thus the alleged criminal conduct of defendant.").

The specific charges that Crawford faces, moreover, like Carpenter's, require general evidence of the events on January 6.  See Fed. R. Evid. 401.  Consider three examples that make this abundantly clear.  First, to prove that he violated 18 U.S.C. § 231(a)(3) (Count I), the Government must show that he committed an act to "obstruct, impede, or interfere with" law enforcement in the performance of their duties "during the commission of a civil disorder which in any way or degree obstructs . . . performance of any federally protected function." 18 U.S.C. § 231(a)(3) (emphasis added).  The Riot Montage is "plainly probative of whether (a) a civil disorder actually transpired, and (b) said disorder obstructed the performance of a federally protected function."  Carpenter, 2023 WL 1860978, at *3.  The Congressional Montage is similarly relevant — even though most of it depicts events that occurred before Congress recessed at 2:15 p.m. — because it demonstrates that Congress was still in recess because of

8

continued obstruction when Crawford engaged in his offense conduct (starting at 4:12 p.m.). Contra Congressional Montage Opp. at 8.

Second, as this Court and others have explained before, "the rioters' collective action is relevant to proving that Defendant disrupted Congress in violation of 18 U.S.C. § 1752(a)(2)," which Crawford is charged with in Count VIII. United States v. Zink, 2023 WL 5206143, at *3 (D.D.C. Aug. 14, 2023); see e.g., United States v. Rivera, 607 F. Supp. 3d 1, 9 (D.D.C. 2022) (defendant disrupted Congress by contributing to overall riot that "collectively disrupted Congressional proceedings"). The Riot Montage, of course, shows such collective action.

Third, for Count X, the Government must prove that Defendant knowingly engaged in "disorderly or disruptive conduct . . . with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress." 40 U.S.C. § 5104(e)(2)(D) (emphasis added). The Congressional Montage, showing that there was in fact a session of Congress occurring, is evidently relevant to the "session of Congress" requirement, while the Riot Montage is probative of the "disorderly or disruptive" conduct one. Indeed, the D.C. Circuit has established that determining whether an individual engaged in disorderly or disruptive conduct requires considering his actions within context. See United States v. Alford, 89 F.4th 943, 950–51 (D.C. Cir. 2024) ("[I]n determining whether an act is disorderly, the act cannot be divorced from the circumstances in which it takes place," and "[w]hether particular conduct is disruptive is . . . a context-sensitive inquiry"); cf. id. at 953 ("[E]ntering the Capitol as part of a crowd rather than as a lone individual magnified the disruptiveness of [the defendant's] presence. Each additional person, no matter how modestly behaved, increased the chaos within the building, the police's difficulty in restoring order and the likelihood of interference with the Congress's work."); contra Riot Montage Opp. at 16 (arguing that the "one 38-second video clip"

9

depicting Crawford "is the only component of the [Riot Montage] that says anything about whether [he] himself participated in or advanced th[e] civil disorder").

Likely aware that his relevance argument is unlikely to persuade, Defendant next submits that even if they are relevant, the montages are simply too prejudicial: the Riot Montage "severely prejudice[s] [him] by inflaming and confusing the issues, and by misleading jurors away from evidence that is relevant," Riot Montage Opp. at 17, while the Congressional Montage "may reasonably lead jurors to blame [Defendant] himself for all the chaos of January 6" and "confuse the issues" because it "highlight[s] the relatively chaotic interruptions at the Congressional sessions" that occurred "hours before [he] appeared on the scene." Congressional Montage Opp. at 9. Again, Crawford's submission misses the mark.

To begin with, those worries about prejudice are overblown. See Stedman, 2023 WL 3303818, at *2 ("To the extent that other members of the mob . . . engaged in criminal conduct, defendant's conduct may be viewed more positively in comparison. Moreover, defendant has an effective tool with cross-examination effectively to differentiate himself from other rioters."). What is more, in the context of the charges brought against Crawford, the weighty probative value of evidence that broadly depicts what happened on January 6 — including congressional proceedings that day — outweighs any potential prejudice. That said, if Defendant objects to any particular images in the Riot or the Congressional Montages as being too prejudicial, he may raise such objections during trial and the Court will address them at that time, but his blanket objections here will not do.

In an effort to play a final trump card (pun intended?), Defendant contends that the videos are needlessly cumulative. See Riot Montage Opp. at 17–18; Congressional Montage Opp. at 9–10. He points to the fact that, after the Government filed its Motions to admit the montages, the

parties agreed to two factual stipulations. First, they stipulated to "facts establishing that a joint Session of Congress took place on January 6, that members of Congress and the Vice President had to evacuate, and that the Senate and House went into recess for a lengthy period of time." Congressional Montage Opp. at 9–10. Second, they stipulated that:

> Beginning at approximately 12:53 p.m. on January 6, 2021, and continuing until approximately 6:30 p.m. on January 6, 2021, the events on the grounds of the United States Capitol constituted a public disturbance that involved acts of violence by assemblages of three or more persons. That public disturbance caused an immediate danger of, or resulted in damage or injury to the property or person of at least one other individual.

Riot Montage Reply at 5.

Those stipulations clearly do not render the Riot Montage cumulative. The first has minimal bearing on its evidentiary value, and the second simply represents an agreement that a "civil disorder" occurred on January 6. See 18 U.S.C. § 232(1) (defining "civil disorder" as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual"). The United States rightly observes that the fact that a "civil disorder" occurred "does not provide a sufficient factual basis for the government to prove the remaining two elements of a violation of 18 U.S.C. § 231(a)(3), nor any of the elements to prove violations of 18 U.S.C. § 1752(a) and 40 U.S.C. § 5104(e)(2)." Riot Montage Reply at 5.

It is less clear whether the Government believes that there are any facts that it needs the Congressional Montage to prove over and above what Crawford has now stipulated to. See Congressional Montage Opp. at 10 ("This stipulation establishes the facts that the government claims the video montage exhibit is required to prove."); ECF No. 44 (Congressional Montage Reply) at 2 (acknowledging that first stipulation was to "the facts presented within" the video).

11

That said, "the prosecution is entitled to prove its case by evidence of its own choice," meaning "that a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the government chooses to present it." United States v. Crowder, 141 F.3d 1202, 1207 (D.C. Cir. 1998) (quoting Old Chief v. United States, 519 U.S. 172, 186–87 (1997)). After all, the government must prove each element of the charged offenses beyond a reasonable doubt, and video evidence certainly packs more punch than a mere stipulation. See United States v. Douglas, 482 F.3d 591, 597 (D.C. Cir. 2007) ("[A] defendant's offer to stipulate or concede an element of an offense . . . does not deprive the government's evidence of relevance. Even if a defendant concedes an element of an offense, the government still has the burden of proving that element to the jury beyond a reasonable doubt.") (cleaned up). The Court therefore agrees with the United States that "[a] stipulation to the facts presented within a less-than-ten-minute video should not serve as a basis for [it] to exercise its discretion in excluding the [Congressional Montage] under [Rule] 403." Congressional Montage Reply at 2.

\* \* \*

As a result, the Congressional Montage may be admitted full stop, and the Riot Montage may be admitted subject to the United States's eliciting the testimony described above to validate the police audio and producing to Crawford the original audio recordings, if it has not already done so.

B. Arrest Videos

Last up: Defendant's Motion to exclude evidence relating to his arrest. See Arrest Video Mot. The Court will offer a brief summary of what transpired there before delving into the parties' arguments about whether such evidence should be admitted.

Early in the morning on July 12, 2023, FBI agents arrived at Crawford's house in Georgia with a warrant for his arrest.  Id. at 1.  Sirens blaring, they announced themselves over a bullhorn and requested that he "[c]ome out with [his] hands up."  Id. at 2.  When he did not oblige, the agents called his wife on the phone, informed her of the warrant, and asked that he exit his house.  Id.  Defendant stepped outside briefly, shouted obscenities, flipped off the agents, and then went back inside.  Id.; see ECF No. 39 (Arrest Video Opp.) at 2.  So began a standoff.

The agents called his wife again, and this time the FBI negotiator got Crawford himself on the phone.  Defendant asked, "What they think they're going to do?  They going to take me to Washington?"  Telephone Call BWC at 0:12–:14.  The negotiator began explaining how arrestees are processed, and Crawford interjected: "Man, I ain't getting out, you're crazy. . . .  They ain't going to let anyone out.  They going to get me up there and stand before a Democrat judge, and have to have a democrat lawyer, and I'm the one in the right!"  Id. at 1:00–:15.

After nearly thirty minutes of back-and-forth, Crawford finally emerged from his house and surrendered.  See Arrest Video Opp. at 2; Arrest BWC at 0:07.  As the agents handcuffed him, he shouted, "Traitor, traitor, traitor, traitor!  Right, you damn right you a traitor.  Locking me up.  I'm the only person in the right right here!"  Arrest BWC at 0:43–:52.  He continued, "Y'all a bunch of traitors.  I got — how ya'll sleep at night?  Huh?  How do you sleep at night?  You American — y'all Americans?  How do you sleep at night?  How do you sleep at night?  Not too good, do you?"  Id. at 1:55–2:06.  As they led him to the van, he cried out, "I'm the only one in the right 'round here.  I'm the only one.  I watched them murder a freaking girl, they beat her in the face for fifteen minutes, man.  Everything I did that day — look at me in the eyes.  Look me in my eyes.  Look in my eyes.  Everything I did that — bitch.  Take me?  I'll beat your ass with these handcuffs on! . . .  Pussy!"  Id. at 2:37–3:01.

The Government intends to introduce two video clips of the agents' body-worn-camera footage from the day of Defendant's arrest: a nearly four-minute clip — the "Telephone Call BWC" — depicting the FBI negotiator's telephone conversation with him, and an approximately three-minute clip — the "Arrest BWC" — showing what ensued when he exited his house. In seeking to exclude those clips and any other "account of the events" related to his arrest, Defendant contends that they are irrelevant and would be an impermissible "attempt to show propensity," such as the character trait of lack of "respect for the law." See Arrest Video Mot. at 4, 6; see Fed. R. Evid. 404(a)(1). The United States retorts that the clips are relevant because his "conduct and statements tend to prove aspects of his whereabouts and conduct on January 6 and his consciousness of guilt." Arrest Video Opp. at 8. Both sides are partially right on relevance.

Beginning with the Telephone Call BWC, the Court fails to see how Crawford's statements to the FBI negotiator have "any tendency" to make a "fact . . . of consequence . . . more or less probable than it would [otherwise] be." Fed. R. Evid. 401(a), (b). His remarks — e.g., "They ain't never going to let me go," Telephone Call BWC at 0:24–:25; and "They going to get me up there and stand before a Democrat judge," id. at 1:07–:11 — simply do not evince a "consciousness of guilt," nor are they probative of his intent or state of mind on January 6. Contra Arrest Video Opp. at 4, 6–7. At most, they indicate "his skepticism about the system and [lack of] faith that he will get a fair shake in Washington," ECF No. 42 (Arrest Video Reply) at 8, but such skepticism is not relevant to the charged offenses or elements thereof.

Insistent that such statements are relevant, the Government characterizes Defendant's behavior as "resistance" to arrest and analogizes it to "flight." Arrest Video Opp. at 3 (citing cases such as Edmonds v. United States, 273 F.2d 108, 114 (D.C. Cir. 1959), holding that evidence of defendant's flight is admissible because it has a "tendency to establish guilt"). In

14

particular, it compares Crawford's Motion to a motion that this Court denied in United States v. Bennett, 2023 WL 6460026, (D.D.C. Oct. 4, 2023), where the defendant sought to exclude evidence that he spent twelve days after learning of his arrest warrant "laying low" before finally self surrendering.  Id. at *6.

The flight analogy is a stretch.  Defendant correctly retorts that his "decision to linger in his home in the face of armed confrontation with law enforcement in the early morning hours of July 12, 2023 . . . ha[s] nothing to do with flight."  Arrest Video Reply at 1.  Nor do his comments to the FBI negotiator constitute the kind of "resistance to arrest" that is admissible as "inextricably intertwined" with the evidence of the charged offenses.  United States v. Wright, 392 F.3d 1269, 1276–77 (11th Cir. 2004) (admitting evidence of resistance to arrest because it "was 'inextricably intertwined' with the charged offense" of firearm possession insofar as such resistance led to discovery of firearm and "[i]f the jury had merely heard evidence of . . . the discovery of the firearm," it "would be relegated to its own, and possibly incorrect, assumptions about the events prior to officers finding the weapon").  Because it finds that the Telephone Call BWC is irrelevant, the Court will preclude its introduction.

The same cannot be said, however, for the Arrest BWC, which captures statements that are in fact probative of Crawford's intent and state of mind on January 6, 2021 — and therefore can be offered for a purpose having nothing to do with his character.  They are thus admissible even if considered to be "other crime, wrong, or act" evidence.  See Fed. R. Evid. 404(b)(2). Recall that the Government must prove that on that day he, *inter alia*, "commit[ted] an[] act to obstruct, impede, or interfere with" law enforcement in the performance of their duties."  18 U.S.C. § 231(a)(3) (Count I).  In other words, it must establish that he acted with an "obstructive intent."  United States v. McHugh, 583 F. Supp. 3d 1, 25 (D.D.C. 2022); see also id. ("[Section]

15

231(a)(3) is a specific intent statute, criminalizing only acts performed <u>with the intent</u> to obstruct, impede, or interfere with a law enforcement officer."). Evidence with "any tendency" to make it more probable that he acted with such intent on January 6 is therefore relevant. <u>See</u> Fed. R. Evid. 401; <u>see also</u> <u>United States v. Duran</u>, 884 F. Supp. 537, 539 (D.D.C. 1995) ("Where . . . a Defendant is charged with a specific intent crime, evidence establishing the Defendant's motive is relevant.").

Here, Defendant's colloquy with the FBI agents arresting him — in which he repeatedly called them "traitor[s]," asked them "how [they] sleep at night," and declared that he was "the only person in the right" — Arrest BWC at 0:43–:52, 1:55–2:06, 2:37–3:01 — reflects such intent. In particular, those statements and others like them make it more likely that on January 6, Crawford acted with the intent to impede "traitor[ous]" law-enforcement officers, none of whom was "in the right." <u>Cf.</u> <u>Bennett</u>, 2023 WL 6460026, at *6 (some of defendant's "public commentary" after January 6 is "probative of his actions that day as well as his intent"); <u>United States v. Fitzsimons</u>, 605 F. Supp. 3d 92, 99–102 (D.D.C. 2022) (defendant's calls to congressional offices — which show anger over actions antagonistic to former President Trump and reference belief that election was stolen — "tend to make [his] motive and intent to obstruct the certification of the election results . . . somewhat 'more . . . probable than it would be without the evidence'") (quoting Fed. R. Evid. 401).

In resisting the notion that such statements are relevant, Defendant emphasizes that his arrest occurred two-and-a-half years after January 6, 2021. <u>See</u> Arrest Video Mot. at 7. True, a jury considering his statements on July 12, 2023, may find them less probative of his intent on January 6, 2021, than contemporaneous statements because of the amount of time that elapsed. But "evidence need not be dispositive of an element of the crime to be relevant[;] it must merely

16

cross the low threshold prescribed by Rule 401." United States v. Slatten, 310 F. Supp. 3d 141, 145 (D.D.C. 2018). For the same reason, Crawford's submission that "none of these statements is necessary to prove that [he] was present at the Capitol on January 6" in light of the "video evidence from the actual day" is beside the point. See Arrest Video Reply at 12.

     Perhaps realizing as much, Defendant acknowledges in his Reply that some of his statements captured on the Arrest BWC are relevant and even concedes that "a case agent can certainly testify to [them]." Id. at 11. It seems, then, that his gripe is not actually with the relevance of the statements he made during his arrest (or even with their admission at trial). Instead, his principal concern is apparently the danger of prejudice if the Arrest BWC — as opposed to just his statements contained therein — is admitted: he refers to that clip as "inflammatory," id., and fears that if it is shown at trial, "there would be a substantial danger that a jury would be inclined to convict based solely on the general sense that [he] is defiant, hostile, and obstructive and not based upon the events of January 6." Arrest Video Mot. at 7.

     That is not a sufficient basis for exclusion. For one, he fails to explain how a case agent's testimony about his statements captured in the Arrest BWC — which he concedes is admissible — "would result in a 'lower danger of unfair prejudice.'" Bennett, 2023 WL 6460026, at *5 (quoting Henderson v. George Washington Univ., 449 F.3d 127, 137 (D.C. Cir. 2006)). Nor could he, since the content of the remarks themselves is what is damning, the tenor of those remarks can easily be inferred from their substance anyway, and the video depicts no serious physical resistance on Crawford's part. For another, Rule 403 "does not bar powerful, or even prejudicial evidence. Instead, the Rule focuses on the danger of unfair prejudice, and gives the court discretion to exclude evidence only if that danger substantially outweigh[s] the evidence's probative value." United States v. Pettiford, 517 F.3d 584, 590 (D.C. Cir. 2008) (cleaned up); see

17

also United States v. Cassell, 292 F.3d 788, 796 (D.C. Cir. 2002) ("Unfair prejudice as used in Rule 403 is not to be equated with [evidence] simply adverse to the opposing party. Virtually all evidence is prejudicial . . . . The prejudice must be unfair.") (cleaned up). The Court perceives no danger of unfair prejudice here. It will thus deny Crawford's Motion as to the Arrest BWC.

### IV. Conclusion

The Court will accordingly grant the Government's Motions *in Limine*, with the caveat expressed, and it will grant in part and deny in part Defendant's Motion. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: May 1, 2024