**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Crim. No. 23-CR-426 (JEB)** |
| | : | |
| **v.** | : | |
| | : | |
| **PHILLIP CRAWFORD,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Phillip Crawford to 78 months' imprisonment, 36 months supervised release, a fine at the court's discretion, $2000 in restitution, mandatory special assessments totaling $695 ($100 for each felony, $25 for each Class A misdemeanor, and $10 for each Class B misdemeanor). The guideline range calculated by the government and confirmed by probation is 63-78 months. The government's recommendation is at the top of the guidelines range because of a number of aggravating factors described herein, primarily the severity of Crawford's violence against several officers defending the United States Capitol Building during the January 6, 2021 riot.

I.      **INTRODUCTION**

The defendant, Phillip "Crawford, participated in the January 6, 2021 attack on the Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in

losses.[1]

Atop the inaugural construction on the West Front of the U.S. Capitol Building, Crawford gave a profanity laden speech to encourage other rioters to storm the Capitol with him. Crawford then joined other rioters outside of the Lower West Terrace entrance while police fended off rioters engaging in intense fighting in the Lower West Terrace tunnel. Crawford chanted, "Pull them out!" in reference to the police officers who were trying to prevent rioters from breaching the building.

Between Crawford's arrival at the tunnel entrance at roughly 4:10 p.m. and when he left at roughly 4:14 p.m., he attacked numerous different officers from both MPD and USCP, as well as another rioter. He struck an unidentified USCP officer, and later MPD Officer H.F. two separate times in the head and upper body area. Crawford wrestled USCP Officer Ch.W. to the ground, pinned him under a shield, and then – while standing over him – Crawford attempted to pull USCP Officer Ch.W. by his leg out of the tunnel and into the angry mob. During this assault, in trapping USCP Officer Ch.W. under the shield, standing atop USCP Officer Ch.W., and using both of his hands to grab and pull USCP Officer Ch.W. by his leg, Crawford physically restrained USCP Officer Ch.W. for a number of seconds, causing USCP Officer Ch.W. to fear for his life. Finally,

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police ("USCP"). The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Crawford grabbed a fallen gas mask and threw it forcefully at MPD Officer Ca.W., who was on the police line, from just feet away.  The gas mask audibly hit MPD Officer Ca.W.'s protective gear.

This Court should sentence Crawford to 78 months of incarceration, 36 months of supervised release, a fine at the court's discretion, $2000 in restitution, and mandatory special assessments totaling $695. A 78-month sentence reflects the gravity and extent of Crawford's violent conduct.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Facts filed in this case, Attachment to ECF 1, for a short summary of the January 6, 2021 attack on the U.S. Capitol Building by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Crawford's activity concentrated in the Tunnel leading to the doors of the West Front of the U.S. Capitol Building.

#### *Attempted Breach of the U.S. Capitol Building and Assaultive Conduct in Tunnel Leading to the Doors of the West Front of the U.S. Capitol Building*

> The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line. *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117  Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

3

One of the most violent confrontations on January 6 occurred near an entrance to the U.S. Capitol Building in the area known as the Lower West Terrace ("LWT"). The entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long. That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the U.S. Capitol Building. The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the U.S. Capitol Building. This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day. Image 1; "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



*Image 1 – The Lower West Terrace Tunnel on Inauguration Day*

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby. Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department (MPD), were arrayed inside the doorway and guarding the entrance. Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist. The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items. Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray. At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people. And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me. So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in. That's about from the distance where I'm sitting here on the dais to that back wall. And from that office in close proximity to where you all held the line, I listened to you struggle. I listened to you yelling out to one another. I listened to you care for one another, directing people

back to the makeshift eyewash station that was at the end of our hall.  And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight."  Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers. The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the previously-mentioned assault of Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force. Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle.  *Id.* (Statement of Sgt. Aquilino Gonell)

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor. MPD Officer Michael Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service. *Id.* (Statement of Officer Michael Fanone)

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 p.m.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area. It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress.

### *Injuries Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and

myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

**B.    Crawford's Role in the January 6, 2021 Attack on the Capitol**

*Crawford's Approach to the Capitol*

Crawford traveled from his home in Georgia to Washington, D.C., arriving either late in the evening of January 5, 2021 or early in the morning of January 6, 2021, to protest the results of the 2020 election. He traveled to D.C. by car with a number of friends, including Daniel "Drew" Andrew Coleman, Jr. and Coleman's two sons.[2] Crawford and his friends stayed at a hotel in Northern Virginia, then traveled to Washington D.C. on the morning of January 6, 2021.

After attending then-President Trump's rally at the Ellipse on January 6, 2021, Crawford and his companions returned to Virginia. However, they returned to Washington D.C. once they heard that supporters of President Trump were heading to the U.S. Capitol Building. Crawford made his way to the U.S. Capitol Building, and at some point separated from his companions.

On his way to the Capitol, Crawford obtained and put on a shirt that said "STOP THE STEAL" in large capital letters with a stop sign in place of the "O" above, and "KEEP

---

[2] As of this filing, the government has not charged any of the Colemans in relation to the attack on the Capitol on January 6, 2021; it is unclear whether any of the Colemans committed criminal offenses while present that day.

AMERICA GREAT" in slightly smaller capital letters below. *See Image 2.*



*Image 2 – Crawford Outside U.S. Capitol Building (still from trial exhibit 600, outline added)*

He wore the shirt for the duration of his time at the Capitol on January 6, 2021.

Once he arrived, Crawford made his way on to the Presidential Inaugural Stage, where he attempted to organize and motivate his fellow rioters to storm the U.S. Capitol Building by shouting an expletive laced speech. Specifically, Crawford yelled, "Hey! We're gonna charge in that motherfucker! Okay? Are y'all pussies or what? I'm looking at one, two, three, four – you ain't got no shit on us. We're all of us, come on! Hunh? I don't give a shit how many there is! Hunh? Now I'm talking…!" *See Image 3.*



*Image 3 – Crawford Giving Rally Cry (still from trial exhibit 602, outline added)*

Crawford then pushed around and climbed over other rioters to reach the LWT tunnel. At one point, Crawford joined other rioters chanting, "Pull them out!" in reference to the officers defending the tunnel, the entranceway that led to the heart of the U.S. Capitol Building interior. *See Image 4.*



*Image 4 – Crawford Chanting "Pull Them Out!" at Tunnel Police (still from trial exhibit 604A)*

11

Rows of police officers were using their bodies to block the entrance into the centrally located door that lay at the end of the LWT tunnel. Entry through this door would have allowed the rioters access to the entire building through a central staircase heading directly into the Crypt and access to more secure areas where members of Congress sheltered.

At approximately 4:10 p.m. Crawford entered through the tunnel archway and grabbed a shield from an unidentified USCP officer who held it for protection. Crawford then used his right hand to forcibly strike the officer over the shield. Using his left hand, Crawford grabbed the shield, pulled it down and out of the way, and then used his right hand to repeatedly strike the officer's head and upper body.

Crawford then dove deeper into the line of officers and, between approximately 4:10-4:11 p.m., forcibly grabbed USCP Officer Ch.W. by his legs causing USCP Officer Ch.W. to fall. Then – while standing over USCP Officer Ch.W. – Crawford pulled USCP Officer Ch.W.'s leg in an attempt to forcibly drag him into the violent crowd. *See Image 5.*



*Image 5 – Crawford Trying to Drag USCP Officer Ch.W. From Tunnel*
*(still from trial exhibit 504A, outline added)*

During this struggle, Crawford wrestled USCP Officer Ch.W. to the ground, pinning the officer under a shield. From the time Crawford grabbed USCP Officer Ch.W., until the time others were able to physically force Crawford to release his hold on USCP Officer Ch.W., Crawford forcibly restrained USCP Officer Ch.W.

This attack was harrowing for USCP Officer Ch.W. USCP Officer Ch.W., who is Black, heard someone call him a racial slur shortly before the attack began. As Crawford dragged him out by his legs, USCP Officer Ch.W. felt his heel drop over the lip of the stairs, down to where Officer

Michael Fanone had been dragged out into and severely beaten by the angry mob less than an hour prior. USCP Officer Ch.W. frantically grabbed for others' ankles to prevent himself from being dragged out into the riotous mob, but felt helpless to protect himself. He feared for his life, and thought of Emmet Till, a black male teenager who was abducted and lynched in 1955 Mississippi after being accused of offending a white woman. USCP Officer Ch. W.'s wife was pregnant with their first child at the time.

Next, Crawford punched another rioter in the face as other rioters looked on in horror and tried to stop Crawford. *See Image 6.*



*Image 6 – Crawford Punching Another Rioter in Face (still from trial exhibit 504, outline added)*

14

At approximately 4:11 p.m., Crawford lunged forward with both arms, reached over other rioters, and grabbed at MPD Officer H.F. with his open right hand, making physical contact with Officer H.F.'s head and upper body. At approximately 4:12 p.m., Crawford struck Officer H.F. again, this time with his left hand, in Officer H.F.'s head and upper body, causing Officer H.F.'s head to immediately jerk forward and down at the time of Crawford's impact. *See Image 7.*



*Image 7 – Crawford Attacking MPD Officer H.F. in the Tunnel (still from trial exhibit 504)*

Finally, at approximately 4:13 p.m., Crawford grabbed a weapon of opportunity, a fallen gas mask, and threw it forcefully at the police line, specifically MPD Officer Ca.W., from just feet away. *See Image 8.*



*Image 8 – Crawford Throwing Mask at Tunnel Officers (still from trial exhibit 400A)*

The mask presented at trial was used by the police who defended the U.S. Capitol Building and those inside on January 6, 2021. It is still covered in dried chemical spray. The mask consists of a large reinforced cylindrical canister, shatterproof plexiglass shield, and metal filter, as well as rubber straps to secure it to the wearer's face. *See Image 9.*



*Image 9 – Photograph of the Mask Presented at Trial (trial exhibit 800)*

Per the Court's own estimate, it weighed close to 3 to 3 ½ pounds. *See* June 18, 2024 Trial Transcript, p. 37, l. 15-17.

### *Defendant's Post-January 6, 2021 Statements*

During an FBI interview on February 22, 2021 regarding his involvement in the January 6, 2021 riot at the Capitol, although Crawford admitted that he was present and participated in a protest, he denied participating in any acts of violence. However, in approximately February or March 2021, according to interviews with a personal acquaintance of Crawford, he eagerly showed a video of security footage from the tunnel to acquaintances and bragged about the footage of him assaulting an officer.

Even after he was arrested, Crawford lacked remorse.  He made the following statements, as captured on body worn camera footage from his 2023 arrest (trial exhibit 507). Specifically, Crawford said:

- "They ain't never going to let me go."

- "I ain't getting out, you're crazy. You see what they did to those people on January 6?"

- "They ain't going to let any out."

- "They going to get me up there and stand before a Democrat judge, and have to have a Democrat lawyer, and I'm the one in the right!"

- "They ain't going to let me go."

When the arresting FBI agent, trying to convince Crawford to come outside, said of Crawford's children, "I think if what they'd like to see is see their dad stand up as an honorable man. Alright?..." Crawford responded, "That's what I did on January 6." As law enforcement arrested Crawford, he called them nerds and traitors, resisted physically, yelled expletives at them,

17

asked them how they slept at night, and said, "I'm the only one in the right 'round here."

Furthermore, Crawford's statements to the Court through the electronic contact portal minimized his criminal conduct. On July 28, 2024, he sent this Court a message which concluded, "[M]aybe Washington lawmakers could think about adopting Georgia's SB92 law.[3] That would really save the court ridiculous amounts of time from over charging people. Trump will help with that soon."

## III.    THE CHARGES AND PLEA AGREEMENT

On March 6, 2024, a federal grand jury returned a superseding indictment charging Phillip Marion Crawford with eleven counts, including the following:

1. Count One, Civil Disorder, 18 U.S.C. § 231(a)(3);
2. Count Two, Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1) at approximately 4:10:45 p.m.;
3. Count Three, Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1) between approximately 4:10:56 p.m. to 4:11:05 p.m.;
4. Count Four, Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1) at approximately 4:11:15 p.m.;
5. Count Five, Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1) at approximately 4:12:04 p.m.;
6. Count Six, Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, 18 U.S.C. § 111(a)(1) and (b)(1)(A) at approximately 4:13:30 p.m.;
7. Count Seven, Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(1) and (b)(1)(A);
8. Count Eight, Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(2) and (b)(1)(A);
9. Count Nine, Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(4) and (b)(1)(A);
10. Count Ten, Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D); and
11. Count Eleven, Act of Physical Violence in the Capitol Grounds or Buildings, 40 U.S.C. § 5104(e)(2)(F).

---

[3] Signed in May 2023, Georgia Senate Bill 92 established the Prosecuting Attorneys Qualifications Commission to serve as an oversight mechanism for district attorneys in the state. Its constitutionality was promptly challenged by local prosecutors.

On May 17, 2024, Phillip Marion Crawford ("Crawford") pled guilty to six charges in the superseding indictment, without a plea agreement:

1. Count One, Civil Disorder, 18 U.S.C. § 231(a)(3);
2. Count Two, Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1) at approximately 4:10 p.m.;
3. Count Three, Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1) between approximately 4:10 p.m. to 4:11 p.m.;
4. Count Four, Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1) at approximately 4:11 p.m.;
5. Count Five, Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1) at approximately 4:12 p.m.; and
11. Count Eleven, Act of Physical Violence in the Capitol Grounds or Buildings, 40 U.S.C. § 5104(e)(2)(F).

*See* ECF 52.

Then on June 18, 2024, after a bench trial on the remaining counts, this Court found the defendant guilty of the following charges after a bench trial:

7. Count Seven, Entering and Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1);
8. Count Eight, Disorderly and Disruptive Conduct in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(2);
9. Count Nine, Engaging in Physical Violence in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(4); and
10. Count Ten, Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D).

On August 27, 2024, the Court issued a Memorandum Opinion (ECF 72) indicating that the Court will find the defendant guilty of Count Six, Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1) (at approximately 4:13:30 p.m.)—without the penalty enhancement for using a deadly and dangerous weapon under § 111(b)—at the sentencing hearing. *See* ECF 72.

As such, we have included convictions for Counts One through Eleven as part of this

analysis.

## IV.    STATUTORY PENALTIES

Phillip Crawford now faces sentencing on: one count of Civil Disorder under 18 U.S.C.

§ 231(a)(3); five counts of Assaulting, Resisting, or Impeding Certain Officers under 18 U.S.C. §

111(a)(1); one count of Entering and Remaining in a Restricted Building or Grounds under 18

U.S.C. § 1752(a)(1); one count of Disorderly and Disruptive Conduct in a Restricted Building or

Grounds under 18 U.S.C. § 1752(a)(2); one count of Engaging in Physical Violence in a Restricted

Building or Grounds under 18 U.S.C.  § 1752(a)(4); one count of Disorderly Conduct in a Capitol

Building under 40 U.S.C. § 5104(e)(2)(D); and one count of Act of Physical Violence in the

Capitol Grounds or Buildings under 40 U.S.C. § 5104(e)(2)(F).

As noted by the Presentence Report issued by the U.S. Probation Office, for his offenses

Crawford faces up to the following:

- On Civil Disorder under 18 U.S.C. § 231(a)(3) – five years imprisonment, a term of supervised release not more than three years, a $250,000 fine, restitution, and a mandatory special assessment of $100;

- On each count of Assaulting, Resisting, or Impeding Certain Officers under 18 U.S.C. § 111(a)(1) – eight years imprisonment, a term of supervised release not more than three years, a $250,000 fine, restitution, and a mandatory special assessment of $100;

- On Entering and Remaining in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(1) – one year imprisonment, a term of supervised release not more than one year, a $100,000 fine, restitution, and a mandatory special assessment of $25;

- On Disorderly and Disruptive Conduct in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(2) – one year imprisonment, a term of supervised release not more than one year, a $100,000 fine, restitution, and a mandatory special assessment of $25;

- On Engaging in Physical Violence in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(4) – one year imprisonment, a term of supervised release not more than one year,

a $100,000 fine, restitution, and a mandatory special assessment of $25;

- On Disorderly Conduct in a Capitol Building under 40 U.S.C. § 5104(e)(2)(D) – six months imprisonment, a $5,000 fine, restitution, and a mandatory special assessment of $10; and

- On Act of Physical Violence in the Capitol Grounds or Buildings under 40 U.S.C. § 5104(e)(2)(F) – six months imprisonment, a $5,000 fine, restitution, and a mandatory special assessment of $10.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government largely agrees with the Guidelines analysis in the draft PSR. However, as explained in our objection thereto, it incorrectly groups Counts 3 and 6, which in fact involve separate victims with the same initials.[4] Here, the Guidelines should be calculated as follows.

Count One: 18 U.S.C. § 231(a)(3)

| U.S.S.G. § 2A2.2(a)[5] | Base Offense Level | | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | | +6 |
| | | **Total** | **20** |

Count Two: 18 U.S.C. § 111(a)(1)

| U.S.S.G. § 2A2.2(a) | Base Offense Level | | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | | +6 |
| | | **Total** | **20** |

Count Three: 18 U.S.C. § 111(a)(1)

| U.S.S.G. § 2A2.2(a) | Base Offense Level | | 14 |

---

[4] While USCP Officer C*h*.W. was the victim in Count 3, *MPD* Officer C*a*.W. was the victim in Count 6.
[5] Counts One and Three arrive at this base offense level by cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

| U.S.S.G. § 3A1.2(b) | Official Victim | | +6 |
| U.S.S.G. § 3A1.3 | Restraint of Victim | | +2 |
| | | **Total** | **22** |

Count Four: 18 U.S.C. § 111(a)(1)

| U.S.S.G. § 2A2.2(a) | Base Offense Level | | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | | +6 |
| | | **Total** | **20** |

Count Five: 18 U.S.C. § 111(a)(1)

| U.S.S.G. § 2A2.2(a) | Base Offense Level | | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | | +6 |
| | | **Total** | **20** |

Count Six: 18 U.S.C. § 111(a)(1)[6]

| U.S.S.G. § 2A2.2(a) | Base Offense Level | | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | | +6 |
| | | **Total** | **20** |

Count Seven: 18 U.S.C. § 1752(a)(1)

| U.S.S.G. § 2A2.2(a)[7] | Base Offense Level | | 14 |
| | | **Total** | **14** |

Count Eight: 18 U.S.C. § 1752(a)(2)

| U.S.S.G. § 2A2.2(a) | Base Offense Level | | 14 |
| | | **Total** | **14** |

---

[6] In light of the Court's dismissal of the charge of U.S.C. § 111(b) at the close of the government's case upon a motion by defense under Federal Rule 29, and this Court's ruling and sentencing denying the dangerous weapons enhancement in *United States v. Harrington,* 23-CR-298 (JEB), the government has elected not to seek the +4 under 2A2.2(b)(2)(B) in this case.

[7] U.S.S.G. § 2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." Here, since Crawford's offenses under 18 U.S.C. § 1752 were committed with the intent to commit a felony – specifically 18 U.S.C. § 231(a)(3) – U.S.S.G. § 2X1.1 applies. *See* PSR ¶ 51.

<u>Count Nine: 18 U.S.C. § 1752(a)(4)</u>

| U.S.S.G. § 2A2.2(a) | Base Offense Level | <u>14</u> |
|---|---|---|
| | **Total** | **14** |

Because Counts Ten and Eleven are Class B misdemeanors, the Guidelines do not apply to them. *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

Section 4C1.1 does not apply in this case due to Crawford's personal use of violence. Crawford physically attacked four officers and one other rioter at the mouth of the Lower West Terrace Tunnel on January 6, 2021. Crawford hit MPD Officer H.F. (twice), an unidentified officer, and another rioter, all in the upper body and facial area. Crawford pinned and dragged USCP Officer Ch.W. Crawford then threw an object at MPD Officer Ca.W. Indeed, Crawford pled guilty to four counts of Assaulting, Resisting, or Impeding Certain Officers under 18 U.S.C. § 111(a)(1) and to Act of Physical Violence in the Capitol Grounds or Buildings under 40 U.S.C. § 5104(e)(2)(F).

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 103. Accordingly, based on the government's calculation of the defendant's total adjusted offense level at 26, Crawford's Guidelines imprisonment range is 63 to 78 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Crawford's felonious conduct on January

23

6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Crawford attempted to rally other rioters to storm the Capitol. He committed several acts of physical violence, mostly against law enforcement officers who were trying to defend the Capitol at the site of the most violent confrontations between police and rioters. The nature and circumstances of Crawford's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 78 months incarceration.

### B.  The History and Characteristics of the Defendant

Crawford is a Master Rigger[8] and former baseball, basketball, and football coach who has lived his whole life in Georgia. At 240 pounds and with his professional and athletic background, Crawford used his body as an instrument to take out his rage on anyone who stood in his way at the Capitol on January 6, 2021.

Crawford had a stable childhood and does not appear to have suffered significant mental or emotional trauma or struggled with substance abuse. While Crawford's Criminal History score is 1, he has a significant history of arrests, charges, and convictions, starting from his teenage years:

- In 1995, the defendant pled guilty to disorderly conduct in Bay County, Florida. PSR ¶ 99.

- In 1997, the defendant was discharged without guilt due to First Offender Treatment for a count of Simple Battery in Cobb County, Georgia. ¶ 105.

- In 2001, the defendant was convicted of two counts of Obstruction of Officer, and one count each of Giving False Name, Giving False Date of Birth, and Public Drunkenness in

---

[8] A Master Rigger is a skilled professional in the field of rigging, possessing advanced knowledge and expertise in lifting techniques, load calculations, and safety protocols.

Douglas County, Georgia due to a November 2000 incident. In this case, the defendant was alleged to have entered a lounge with a nine inch knife while intoxicated and acted in a boisterous, profane, and loud manner with unbecoming language. When he was confronted by police, he proceeded to attempt to run from the officer after being told to stop and provided false information in an attempt to mislead the officer as to his true birthdate and identity. For his actions in this case, Crawford was sentenced to a total of 24 months of jail, but allowed to serve that on probation. PSR ¶ 101.

- In 2002, the defendant was charged with Carrying a Concealed Weapon and Aggravated Assault in the 7th Judicial Circuit, Volusia County, Florida. The Charging Affidavit alleged that Crawford told the black female victim that he did not like blacks, after which a verbal disturbance ensued, at which time Crawford threw a cup of beer in the victim's face. After they called police, Crawford told the victim and her husband that he would kill them both while holding a handgun. However, 20 days after the incident the government filed intent not to prosecute this case and it was closed. PSR ¶ 106.

- In 2005, the defendant was convicted of Theft by Taking in Cobb County, Georgia in connection with a 2004 incident wherein he allegedly took welding equipment valued in excess of $500. For this offense, Crawford was sentenced to 12 months of custody, but allowed to serve that on probation. (However, he went on to serve some amount of that time in custody when probation was revoked the following year for failing to complete anger management counseling.) PSR ¶ 102.

The defendant's crimes on January 6 were not an isolated event in an otherwise law-abiding life. They came, instead, after a long-standing series of criminal offenses, including multiple offenses that involved a weapon. The defendant's criminal history demonstrates a propensity towards violence that is concerning, particularly in light of his growing up in a household with "love, stability and structure." *See* PSR ¶ 103. The defendant's history and characteristics, including his history of arrest, charging, and conviction for offenses with weapons, weigh in favor of a lengthy term of incarceration and a sentence at the high end of the Guidelines range.

25

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Crawford's criminal conduct on January 6 was the epitome of disrespect for the law. His behavior upon his subsequent arrest for his crimes and comments to the Court about the prosecution itself reinforce Crawford's continued contempt for our system of justice.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[9] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, although the defendant is in Criminal History Category I, his history of arrests, charges, and convictions show a pattern of criminal behavior, including prior weapons possession. *See* Section VI(B) *supra.* Second, the defendant has not expressed remorse for his behavior on January 6, 2021. To the contrary, based on his statements since then, Crawford is proud of his

---

[9] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

actions that day. He bragged about them to acquaintances and even the law enforcement officers who arrested him. Crawford has never once displayed contrition for his crimes against his victims on January 6, 2021. And, based on his statements to the Court since his conviction in this case, he continues to believe he will evade responsibility for his crimes.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and

consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[10] "When an offense is uniquely serious,

---

[10] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[11] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

For instance, in *United States v. Ralph Joseph Celentano III,* 22-CR-186 (TJK), Judge Kelly sentenced the defendant to 78 months of incarceration after similarly finding him guilty of 18 U.S.C. § 111(a)(1), 18 U.S.C. § 231(a)(3), 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 18 U.S.C. § 1752(a)(4), and 40 U.S.C. § 5104(e)(2)(F). Celentano's conduct consisted of assaults involving making contact with one officer while breaking through the police line, fighting with other officers on the line, shoving an officer, and tackling an officer. In *United States v. Christopher Roe,* 23-CR-277 (CKK), Judge Kollar-Kotelly sentenced the defendant to 70 months incarceration upon the government's recommendation of 71 months incarceration for three counts of 18 U.S.C. § 111(a) that largely consisted of hand-to-hand combat. Finally, in *United States v. Albuquerque Head,* 21-CR-291 (ABJ), Judge Berman Jackson sentenced the defendant to 90

---

[11] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

months after the defendant pled guilty of one count of 18 U.S.C. § 111(a) for his actions, which included dragging Officer Fanone out of the LWT tunnel. Crawford's committed significantly more assaults on more victims than Head did on January 6, 2021.

Here, in addition to Civil Disorder and the misdemeanor offenses, Crawford was convicted of five counts of assaulting at least four different officers. His guidelines analysis would be higher were it not for the fact that he hit Officer H.F. twice. While there were other January 6 defendants whose behavior that day was similar, there is no comparator who was convicted of assaulting this many officers. Crawford hit officers. He wrestled, pinned, and dragged Officer Ch.W toward the violent mob causing Officer Ch.W. to fear he was going to die. He threw a heavy-duty, police-issued, professional-grade gas mask at Officer Ca.W. so hard that it can be heard above the deafening sounds on the already loud video. Given his violent actions, the government's sentencing recommendation is the minimum necessary to achieve the goals of sentencing.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).

Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But because Crawford was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the

court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[12]

Because the defendant in this case engaged in criminal conduct in tandem with  hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Crawford to pay $2,000 in restitution for his convictions on Counts One through Nine. This amount fairly reflects Crawford's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered

---

[12] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

Furthermore, we additionally request that the imposition of the order of restitution be left open for an additional 90 days after sentencing to provide proof that the defendant personally and proximately caused injury to Crawford's identified victims: USCP Officer Ch.W.; MPD Officer H.F; and MPD Officer Ca.W. *See* 18 U.S.C. § 3664(d)(5). While these victims have not yet identified restitution costs, the government would ask that they be given additional time should they wish to do so within a reasonable time frame.

## VIII.  FINE

The defendant's convictions subject him to a statutory maximum fine of $250,000 each for violations of 18 U.S.C. § 231(a)(3) (Count One) and 18 U.S.C. § 111(a)(1) (Counts Two through Six). *See* 18 U.S.C. § 3571(b). The defendant's convictions subject him to a statutory maximum fine of $100,000 each for violations of 18 U.S.C. § 1752(a)(1) (Count Seven), 18 U.S.C. § 1752(a)(2) (Count Eight), and 18 U.S.C. § 1752(a)(4) (Count Nine). *See id.* The defendant's convictions subject him to a statutory maximum fine of $5,000 each for violations of 40 U.S.C. § 5104(e)(2)(D) (Count Ten) and 40 U.S.C. § 5104(e)(2)(F) (Count Eleven). *See id.*

In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the

defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not submitted a Net Worth Statement, Monthly Cash Flow Statement, or any supporting documentation about his income, assets, liabilities, and debts, nor has he not submitted his federal income tax returns or consented to the release of his credit report. PSR ¶ 132, 137. As such, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e).

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 78 months' imprisonment, 36 months supervised release, a fine at the Court's discretion, at least $2000 in restitution, and mandatory special assessments totaling $695.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

*/s/ Mindy Deranek*
MINDY DERANEK
Assistant United States Attorney
WA Bar No. 43085
601 D. Street, NW
Washington, DC 20530
(202) 252-7776
Mindy.Deranek@usdoj.gov

*/s/ Adam Dreher*
ADAM DREHER
Michigan Bar No. P79246
Assistant United States Attorney
601 D. Street, NW
Washington, DC 20530
(202) 252-1706
Adam.Dreher@usdoj.gov